DAVID E. RIGGINS, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 19873

March 28, 1991                                    808 P.2d 535

*Mace J. Yampolsky,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy District Attorney, and *Bill A. Berrett,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, YOUNG, J.:

On November 20, 1987, appellant David Riggins rode with his roommate, Lowell Pendrey, to Paul Wade's apartment, where Pendrey waited outside while Riggins went in for about half an hour. Shortly after Riggins left Wade's apartment, Wade's girlfriend went to his apartment when she was unable to reach him by telephone. She found Wade dead on the floor with multiple stab wounds and a number of dog bites. Police arrested Riggins the next evening. He was charged with first degree murder and robbery, both with use of a deadly weapon. After being found competent to stand trial, Riggins pleaded not guilty and not guilty by reason of insanity. Following a four-day trial held in November 1988, Riggins was convicted by a jury of first degree murder and robbery, both with use of a deadly weapon. The jury sentenced Riggins to death.

Within a week of being incarcerated, starting in late November 1987, Riggins was put on Mellaril, an antipsychotic drug. The medication was commenced because Riggins complained of hearing voices; he continued to be medicated through trial the following November, with increased dosages in December 1987, January, May, and July 1988. During February and March 1988 when Riggins was examined and found competent to stand trial, he was medicated with 450 mg. of Mellaril per day. At trial, Riggins was medicated with 800 mg. of Mellaril per day.

In June, defense counsel filed a motion to terminate administration of medication, arguing that medication during trial violated Riggins' right to present a defense and that Riggins had done nothing to demonstrate a need for medication. The State opposed the motion, contending that the medication was necessary to maintain Riggins' competency to stand trial. The court denied the motion following a hearing held in July.

On appeal, Riggins contends that his involuntary medication with antipsycotic drugs during the trial violated his Sixth Amendment right to a full and fair trial by depriving him of his right to present his natural demeanor to the jury as part of his insanity defense. Riggins also argues that the district court abused its discretion in denying his motion to terminate administration of medication. The State contends that the denial of the motion was within the discretion of the trial court and should not be disturbed on appeal absent a clear showing of abuse. *See, e.g.,* Sparks v. State, 96 Nev. 26, 30, 604 P.2d 802, 804 (1980).

The question whether forced medication during trial violates a defendant's constitutional right to present a defense is one of first impression in Nevada. Other states that have considered this question all agree that the accused's demeanor has probative value where his sanity is in issue. *See, e.g.,* Commonwealth v. Louraine, 453 N.E.2d 437 (Mass. 1983); State v. Law, 244 S.E.2d 302 (S.C. 1978). However, states are evenly divided over whether expert testimony about the effect of the medication can substitute for the jury's firsthand observation of the defendant's natural demeanor.

Those courts that have compelled medication have viewed the defendant's psychological makeup as evidence that can be explained to the jury. Accordingly, they have required that the jury be informed of the effect that the medication has on the defendant's behavior. *See, e.g., Law,* 244 S.E.2d 302. On the other hand, those courts that have upheld the defendant's right to be tried while unmedicated conclude that expert testimony may not substitute for firsthand observation of the defendant's natural demeanor. *See, e.g., Louraine,* 453 N.E.2d 437.

In this case, there was ample expert testimony regarding the effect that the Mellaril had on Riggins. After reviewing the differing decisions, we are persuaded that expert testimony was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony. Accordingly, the district court did not abuse its discretion in denying the motion to terminate medication. Moreover, the denial of Riggins' motion to terminate medication did not deprive him of his rights to a full and fair trial and to present a defense. *Compare Law,* 244 S.E.2d at 306-307.

The jury's special verdict reveals that only one of the alleged aggravating circumstances was proved beyond a reasonable doubt: that the murder was committed while Riggins was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery, burglary, or kidnapping in the first degree. Riggins contends that the evidence was insufficient to establish burglary as an aggravating circumstance because there was no breaking and entering nor intent to commit a felony within Wade's house.

However, the instruction allowed the jury to find aggravation if Riggins was engaged in robbery *or* burglary. Because the jury found Riggins guilty of robbery during the guilt phase, they likely found that he committed the murder during the commission of the robbery, eliminating the necessity of establishing a breaking and entering with intent to commit a felony. We conclude that the jury's finding with respect to aggravation was supported by substantial evidence.

Riggins next contends that the voir dire violated his Sixth Amendment right to an impartial jury because the cursory questioning of the venire panel as a whole did not afford a reasonable assurance that individual prejudice would be revealed. Riggins also argues that the district court abused its discretion in denying his motion for individual sequestered voir dire.

In the designation of the record on appeal, Riggins' counsel designated "[a]ll pleadings and motions, the complete trial transcripts, *excluding voir dire,* and the Judgment of Conviction." (Emphasis added.) Thus, the record does not contain a transcription of the voir dire. Nor does the record contain the State's oral opposition to the motion and the possible basis of the district court's ruling on sequestered voir dire because counsel did not designate transcripts of the hearing on the motion.

It is the responsibility of the objecting party to see that the record on appeal before the reviewing court contains the material to which they take exception. If such material is not contained in the record on appeal, the missing portions of the record are presumed to support the district court's decision, notwithstanding an appellant's bare allegations to the contrary. *See, e.g.,* State v. Zuck, 658 P.2d 162, 165-66 (Ariz. 1982); People v. Wells, 776 P.2d 386, 390 (Colo. 1989). Moreover, the scope and manner of voir dire examination is within the sound discretion of the district court and, on review, such discretion is accorded considerable latitude. Cunningham v. State, 94 Nev. 128, 130, 575 P.2d 936, 937-38 (1978) (quoting Oliver v. State, 85 Nev. 418, 424, 456

P.2d 431, 435 (1969) and Spillers v. State, 84 Nev. 23, 27, 436 P.2d 18, 20 (1968)). For the foregoing reasons, we reject appellant's assignments of error regarding the voir dire examination.

Riggins next contends that the district court abused its discretion in denying his motion for co-counsel. He maintains that the court's failure to appoint co-counsel deprived him of his constitutional right to the effective assistance of counsel. After reviewing the record, however, we conclude that the district court did not abuse its discretion, pursuant to NRS 260.060, in denying the motion for co-counsel. *See* Sechrest v. State, 101 Nev. 360, 368, 705 P.2d 626, 632 (1985).

Riggins also contends that the district court abused its discretion in admitting a number of photographs during the penalty phase. He contends that the photographs, which depicted various scenes from the victim's apartment after the homicide, were duplicative because expert testimony and photographs previously admitted during the guilt phase were sufficient to illustrate the State's theory of murder by torture. Further, he asserts that the photographs were gory and inflammatory, and unduly prejudiced him. The State contends that the photographs were relevant and admissible to show torture, one of the three aggravating circumstances alleged by the prosecution.

Pursuant to NRS 48.035(2), the trial judge has discretion to exclude relevant evidence if its probative value is substantially outweighed by considerations including needless presentation of cumulative evidence. Moreover, under NRS 48.035(1), relevant evidence is not admissible if the danger of unfair prejudice substantially outweighs the probative value of the relevant evidence. However, NRS 175.552 allows evidence during the penalty hearing that may ordinarily be inadmissible.

Without deciding whether the photographs admitted during the penalty hearing were duplicative, we conclude that, given the trial court's broad discretion and the provisions of NRS 175.552, there was no error in allowing the photographs into evidence.

Lastly, Riggins contends that the district court erred in allowing the State to cross-examine Lowell Pendrey, the sole defense penalty phase witness, regarding his alleged homosexual relationship with Riggins. Riggins asserts that the court further erred in allowing the State's rebuttal witness to testify concerning a conversation she overheard regarding this alleged relationship. Riggins contends that this testimony inflamed the jury and unduly prejudiced him, requiring a new penalty hearing.

During cross-examination, Pendrey denied having a conversation in which he allegedly acknowledged that he and Riggins were homosexual lovers. The prosecution then called Ellen Bezian, sister of the victim's girlfriend, to rebut Pendrey's truthfulness. Over defense counsel's objection, the court first ruled that the State's effort to impeach Pendrey with questions about the conversation did not involve a collateral matter. Following two additional objections by defense counsel, the court ordered stricken the entire conversation, apparently finding the conversation too tenuous for impeachment purposes. The court then instructed the jury to disregard the conversation.

We conclude that the cross-examination of Pendrey was proper for purposes of showing possible bias. Therefore, we conclude that the district court did not err in initially allowing the prosecutor to question Bezian about the conversation.

In reviewing the overall record, we conclude that Riggins' contentions lack merit and that the sentence was not excessive, considering both the crime and the individual characteristics of the defendant. We hereby affirm his death sentence and the underlying convictions of first degree murder and robbery with use of a deadly weapon.

MOWBRAY, C. J., and STEFFEN, J., concur.

ROSE, J., concurring:

I am concurring with the majority because I would have preferred two points to have been better established by the record. First, the fact that Riggins needed to be on the prescribed drug; and second, that he could not adequately function if the medication were terminated.

When Riggins was arrested, he complained of hearing voices and having trouble sleeping. He told Dr. Edward Quass, a psychiatrist, that he had taken Mellaril before and it had helped him. After a ten minute examination, Dr. Quass prescribed 100 milligrams a day because, as he said, Riggins had been on the drug before. Dr. Quass increased the amount to 800 milligrams a day because Riggins continued to hear voices and requested an increase in the dosage.

The court would not permit Riggins to terminate the massive dosage of Mellaril prior to trial to determine if he could function without the drug. Instead, the court relied on what psychiatrists thought would happen if the medication were stopped. A better method to determine the effects of stopping the medication would be to actually do so, and observe the results on the defendant. This is especially true in this case where two of the psychiatrists opined that Riggins' psychosis was probably caused by drug

abuse; and if that were the case, terminating the drug would have no effect on his behavior. Since two of the four psychiatrists believe that the termination of Mellaril would have no effect on Riggins, he should have been given the opportunity to suspend the taking of it and let it be seen if it had an effect on his behavior.

No defendant should be involuntarily medicated during his trial unless it is truly necessary. This is especially true in a capital case where the defense is insanity. A defendant's right to have the jury observe his actions and demeanor should not be prevented unless it is absolutely required. One way to determine if it is necessary would be to suspend the taking of the medication and observe the defendant's behavior. This was not done with Riggins.

However, we have previously held that when a defendant is involuntarily medicated during trial, we will review the entire record to determine whether he was denied a fair trial and whether the defendant's appreciation of the events of trial was diminished. Lizotte v. State, 102 Nev. 238, 720 P.2d 1212 (1986). From my review of the record, Riggins was not denied a fair trial and it is not shown that he lacked an appreciation of the trial. Two psychiatrists who had prescribed Mellaril for Riggins, Dr. Quass and Dr. O'Gorman, testified that they believed it was helpful to him. Additional psychiatric testimony established that Mellaril may have increased Riggins' cognitive ability and prevented him from dangerous behavior.

While a review of the entire record meets the standard we set in Lizotte, I would prefer a stronger showing that the medication was absolutely necessary, and evidence establishing how the defendant behaved without it.

SPRINGER, J., dissenting:

This case is another[1] in which we are faced with a novel legal issue presented by courtesy of modern medical science. It seems that the medical doctors are now quite capable of conjuring in their insane clients a sort of "synthetic sanity"[2] by infusion into their brains a class of drugs, called variously "psychotropic," "neuroleptic," or "antipsychotic." These drugs have been in use for perhaps thirty years and are known to act chemically on the nerve cell receptors of the brain in a manner—sometimes referred to as a "chemical lobotomy"—which rather drastically alters the thinking processes, emotional responses, behavior and appearance of those whose brains have been "seized"[3] by these powerful drugs.

---

[1]See, for example, McKay v. Bergstedt, 106 Nev. 808, 801 P.2d 617 (1990) (SPRINGER, J., dissenting).

[2]State v. Hampton, 218 So.2d 311, 312 (La. 1969).

[3]The word "neuroleptic" denotes a "seizure" of the nerves of the brain.

So powerful are these drugs that a highly mentally disturbed insane person can be made to appear perfectly sane. These drugs so well mask underlying mental disorders that persons who are agreed by all to be mentally incompetent and thus unfit to stand trial can be drugged into a mental state in which psychotic symptoms disappear. There is, however, a price to pay for this "neurolepsis." The synthetically sane defendant becomes mentally and emotionally inert and in a state of chemically induced tranquility.[4] Wildly psychotic persons frequently become docile and apathetic. The medical literature frequently uses the word "zombie" to describe the appearance and behavior of neuroleptic patients. The synthetically sane personality is characterized by indifference to what is going on and by "boredom, lethargy, docility and purposelessness."[5]

My point is very simple: I do not think that these drugs should be *forced* down the throats of these defendants, thereby inducing an unnatural and unwanted state of consciousness, just so the state can bring them to "justice." Riggins pleaded with the trial court to leave him alone and not allow the state to drug him into being someone he was not. I think the court erred when it refused to give Riggins protection from state mind-control by forced drugging.

More and more of these kinds of cases are coming to the attention of this court. The following illustrates a representative pattern of the way in which psychotics are often treated in the criminal justice system. The procedures, which I now outline, do not necessarily fit exactly the facts of this case, but they do show the kinds of medical and legal procedures that give rise to my concern. Here is the kind of treatment that I am talking about:

> *Stage One:* An obviously mentally disturbed person commits a crime. Police necessarily refer the person to "mental health professionals."
>
> *Stage Two:* Psychiatrists or psychologists see the arrestee and, seeing that the person is confused, out of contact with reality and suffering from delusions and vivid auditory or visual hallucinations, conclude that the person is suffering from psychosis and should be institutionalized for treatment. (At this time the doctors frequently are in agreement that the arrested person was psychotic at the time of the commission of the crime.)
>
> *Stage Three:* The psychotic person is placed in confinement

---

[4]These drugs used to be called "major tranquilizers."

[5]*See* Comment, *Madness and Medicine: The Forcible Administration of Psychotropic Drugs,* 1980 Wis.L.Rev. 497, 512.

where "treatment" is instituted by administering the mentioned "major tranquilizers." Pretty soon the "patient" is "zombified" to the extent that he or she is no longer ranting or raving and, although a little sleepy most of the time, looks to be as sane as you or I.

*Stage Four:* The then psychotic but synthetically sane person is sent back to the criminal justice system with a doctor's certificate saying that the psychotic person is now sane and fit to stand trial.

*Stage Five:* The synthetically sane zombie sits smilingly through the trial, listening indifferently to "experts" testify that he or she is presently mentally competent and was mentally competent at the time of committing the crime. The tranquilized defendant obligingly nods assent to whatever is being said.

*Stage Six:* The jury understandably assumes that the defendant was as sane at the time of the crimes as he appears to be in court. The defendant is convicted. The drugs are withdrawn, and the psychotic state resumes.

I am hoping that this kind of drug abuse, this kind of intrusion into the inner sancta of human personalities will be seen for what it is, oppressive and violative of the human dignity of those who are forced to submit to the demands of the white-coated syringe bearers. For those who cannot see the outrage of this kind of mind control on its face, I will proceed now to cite legal authority for putting an end to these procedures.

### Right to Appear and Defend

Forceful administration of these mind-altering drugs (particularly upon a person who has been declared legally sane[6]) is an interference with one's right to "appear and defend" against charges in a criminal case. With the use of these drugs medical science can now alter the chemical workings of the brain and radically interfere with one's emotional and thought processes. Before the advent of these drugs the United States Supreme Court was able to observe: "Freedom to think is absolute of its own nature; the most tyrannical government is powerless to control the inward workings of the mind." Jones v. Opelika, 316 U.S. 584, 618 (1942) (Murphey, J., dissenting), *rev'd,* 319 U.S. 103 (1943). That was in 1942; it is, of course, no longer true that the

---

[6]In Ford v. District Court, 97 Nev. 578, 635 P.2d 578 (1981), this court, in issuing a writ of mandamus, stated that the trial court had exceeded its jurisdiction when it ordered a competent defendant to submit to the administration of drugs. One would think that the ruling in *Ford* was controlling in this case.

government is powerless to control the inward workings of the mind. It can control the inward workings of the mind by forced druggings. The government, in this case, forcefully and over the strongest protest, was exerting control over the inner workings of the mind of David E. Riggins. Although "1984" has come and gone, the Orwellian "Thought Police" are now within the realm of scientific possibilities. As Justice Brandeis so wisely observed in his dissent in Olmstead v. United States, 277 U.S. 438, 479 (1927), "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." The state may be telling us that it is only "treating" these people for their own good, but it seems to me that the beneficent goal of treatment is being turned into an "insidious encroachment" on the dignity and integrity of humans who ought to have the right to refuse to be drugged into an unnaturally tranquil and submissive state.

The criminally accused have a fundamental right to be present at their trial and to confront witnesses against them. This right derives from the common law and is required by our sense of natural justice. Such rights are embodied in the sixth and fourteenth amendments to the United States Constitution and in article 1, section 8 of the Nevada Constitution, which provides that "the party accused shall be allowed to appear and defend in person."

That right to be present at one's own trial necessarily means the right to be present as one really is, not as a chemically-conjured *persona* which bears little resemblance to the "real" person as he or she would be in the natural, undrugged state. Competent persons (as Riggins was judicially declared to be) defending against criminal charges should not, in any system of criminal justice, be compelled against their will to take into their brain drugs which radically alter their thinking, emotion and behavior.

In a case comparable to the one now before us, State v. Maryott, 492 P.2d 239 (Wash.App. 1971), the trial court allowed the state to continue administration of librium and other "minor" tranquilizers to the defendant against his will. The Washington Court of Appeals reversed his conviction, holding that to allow the state to administer drugs against the defendant's will was to allow the state to alter the judgment and mental capacity of its adversary. The court observed that "[o]ur total legal tradition is contrary to this." 492 P.2d at 241. I agree.

The *Maryott* court drew a parallel between the state's forced use of drugs and the use of chains and torture. Both affect the ability of an accused to use freely his mental faculties at trial. The court stated that "[a]lthough drugs have not always been the subtle menace they now are in our society, action by the state which affected the reason of a defendant at the time of trial was forbidden at an early time." *Id.* at 241.

A criminal defendant should not be deprived of his or her right to "appear and defend" by means of the state's forced administration of antipsychotic drugs. An accused has a right to be present at the trial in a natural state, free from the effects of modern mind meddling.

### Right to Present Evidence

Riggins has also been denied his right to present relevant evidence, specifically, *himself,* in his true mental state. Where, as here, the sole issue at trial is the defendant's mental state, the most compelling evidence available is the defendant himself. No testimony of psychiatrists, psychologists, social workers, friends or family can approach the insight a jury is afforded by the opportunity to see and hear the defendant, *as is.* In order to be of any real benefit to the finders of fact the defendant must be presented in his natural state, not under the influence of mind altering drugs. It is the quality of Riggins' natural mental state that is at issue here. By distorting Riggins' natural mental condition, the state masked evidence critical to the sole issue at trial. The state was allowed to cover Riggins' personality with a chemical veil that prevented the jury from seeing the accused as he really was.

This court has previously recognized that the conduct and demeanor of a defendant after the crime are relevant to the jury's consideration of insanity at the time of the offense. Sollars v. State, 73 Nev. 248, 316 P.2d 917 (1957); State v. Lewis, 20 Nev. 333 (1889). The weight to be given to the defendant's after-the-fact mental condition is a function of the jury. In *Sollars,* above, we quoted from 2 *Wigmore on Evidence* (3d. ed.) 25, § 233:

> A condition of mental disease is always a more or less continuous one, either in latent tendency or in manifest operation. It is therefore proper, in order to ascertain the fact of its existence at a certain time, to consider its existence at a prior or subsequent time.

73 Nev. at 261, 316 P.2d at 924.

The courtroom demeanor of a defendant is the most reliable evidence of mental condition. Certainly an "expert" cannot draw

a verbal picture of a defendant's condition that is anywhere near as reliable as would be an observation of the defendant in an undrugged, natural state. In *State v. Lewis*, above, we discussed the limitations of verbal description as opposed to direct observation:

> As a general rule it is undoubtedly true that it is the facts which a witness gives of the conduct, acts, manner, and conversations of the defendant which constitute the greatest value of his testimony, and that the testimony of a witness having but a limited knowledge upon these matters ordinarily has but little, if any, weight with the jury; but it is not true that a witness is bound to give, or that he can in all cases give, the glare of the eye, the wild look, the peculiar expressions, or strange demeanor of the defendant. *There are many cases where the mental condition of a person depends as much, or more, upon his looks and gestures, connected with his acts, conduct, or conversation, as upon the words and actions themselves;* and it would be difficult, and sometimes impossible, for the witness to intelligently give all of the details upon which his opinion is based.

20 Nev. at 345-46 (emphasis added).

In Washington v. Texas, 388 U.S. 14, 19 (1967), the United States Supreme Court announced that few rights are more fundamental in our jurisprudence than that of an accused to present his or her version of the facts. Here Riggins was not permitted to present his version of the facts because evidence crucial to that version was suppressed by the drugs that had permeated his brain. Throughout the trial the jury sat and watched Riggins in a controlled and to the jurors what was apparently his normal mental state. Little wonder it is that the jury concluded that Riggins was in a similar, composed state at the time of the bizarre and brutal slaying in this case.

In disapproving the forceful administration of mind-altering drugs to criminal defendants, I do not mean to be understood as saying that these drugs should never be employed in a prosecutorial context. There may be times when the defendant himself may seek the help of these drugs; and there may even be ways in which the drugs can be employed in a manner in which the defendant's basic right to be and remain *himself* is not curtailed. I object only to forcing drugs upon people who do not want to be drugged.