BOBBIE THOMAS, Individually and as Special Administra-
tor of the ESTATE OF JESSE RAY THOMAS; and
BRANDI LIN THOMAS, Appellants, v. WAYNE HARD-
WICK, M.D.; NORTHERN NEVADA EMERGENCY
ROOM PHYSICIANS; and WASHOE MEDICAL CEN-
TER, Respondents.

No. 48329

May 27, 2010 231 P.3d 1111

*Osborne, Ohlson & Hall, Chtd.*, and *Ann O. Hall* and *John Ohlson*, Reno, for Appellants.

*Lemons Grundy & Eisenberg* and *Alice Campos Mercado*, Reno, for Respondents Hardwick and Northern Nevada Emergency Room Physicians.

*Piscevich & Fenner* and *Margo Piscevich*, Reno, for Respondent Washoe Medical Center.

*Burris, Thomas & Springberg* and *Andrew Thomas*, Las Vegas, for Amicus Curiae Nevada Justice Association.

## OPINION

By the Court, PICKERING, J.:

Bobbie Thomas appeals from a judgment entered on a defense verdict in her wrongful death suit against Dr. Wayne Hardwick, his practice group, and Washoe Medical Center. Her suit alleges that medical malpractice led to her husband's preventable heart attack and death two weeks after Dr. Hardwick saw him for chest pain complaints in WMC's emergency room. On appeal, Thomas asserts that errors by the trial court in managing voir dire, admitting certain evidence, and not imposing meaningful sanctions on WMC for its negligent loss of evidence deprived her of a fair trial. Separately, she appeals the trial court's dismissal on statute-of-limitations grounds of the amended complaint by which her daughter, Brandi, sought to join the suit as an additional named plaintiff.

Not all the errors claimed are properly before this court. Those that are permit reversal and a new trial only if an abuse of discretion affecting substantial rights is shown. Because that showing has not been made, we affirm.

### I.

Jesse "Ray" Thomas had undetected, advanced-stage coronary artery disease. On January 13, 2003, two weeks before his fatal heart attack, he went to WMC's emergency room, complaining of chest pains and sweatiness. The electrocardiogram and troponin tests Dr. Hardwick ran ruled out recent heart attack but not cardiovascular disease as the cause of his symptoms. The core question at trial was what Dr. Hardwick told Mr. Thomas when he saw him in the emergency room on January 13. Did Ray Thomas leave the hospital that day against medical advice, as respondents WMC and Dr. Hardwick maintain? Or was Ray Thomas told he was "fit as a fiddle" and could safely leave, as appellant Bobbie Thomas maintains?

The evidence at trial was that Ray Thomas's heart disease may have been treatable if it had been diagnosed earlier. The tests run in the emergency room did not rule out cardiovascular disease, which Mr. Thomas's chest pains and other symptoms suggested he might have. The standard of care required Dr. Hardwick to counsel Mr. Thomas to agree to be admitted to the hospital for observation and testing, especially since Mr. Thomas's history disclosed he had no regular primary care physician.

A copy of Mr. Thomas's hospital chart was authenticated in discovery and used at trial.[1] The chart reflects that he left the emergency room on January 13, 2003, against medical advice or "AMA." It contains an order by Dr. Hardwick directing hospital staff to ask Mr. Thomas to sign an AMA release, but no signed release was ever produced. Dr. Hardwick sees thousands of patients each year and could not recall Mr. Thomas specifically. Based on his dictated chart notes and customary practice in treating chest pain patients, Dr. Hardwick testified that he urged Mr. Thomas to be admitted for observation and testing but he refused. An attending nurse gave similar testimony about her handwritten chart notes, which said the patient was "refusing to be admitted. M.D. aware."

Bobbie Thomas disputed this evidence. She testified that she came to the emergency room with her husband and sat in on his conversations with Dr. Hardwick. She remembered Dr. Hardwick saying that, while he normally urged chest pain patients to be admitted, her husband's preliminary test results were good enough for him to go home, so long as he followed up promptly with a private physician. A family member arrived as the Thomases were preparing to leave. He recalled Ray Thomas saying, within earshot of Dr. Hardwick, who said nothing, that the doctor had told him he was lucky and could safely leave.

Mr. Thomas's symptoms subsided before he left the emergency room. Hospital staff gave the Thomases papers suggesting he follow up with a personal physician and return to the emergency room immediately if his chest pains recurred or he experienced unusual sweating or problems breathing. One form warned that chest pain could indicate a life-threatening condition; another provided names and addresses of follow-up health care options. A fellow worker testified that Mr. Thomas complained about not feeling well the day before his fatal heart attack. However, Mr. Thomas did not seek further medical care after leaving the emergency room beyond calling several physicians' offices to ask about possible care.

Trial lasted five days. The parties presented a number of witnesses, including experts. After deliberating for less than

---

[1] After copying the original chart at Bobbie Thomas's request and consulting it to answer interrogatories, WMC lost the original of Ray Thomas's emergency room chart. This became the basis for the sanctions proceedings that are discussed *infra*, at section II.C.

two hours, the jury returned a unanimous verdict finding no negligence.

## II.

### A. *Voir dire*

Thomas's first assignment of error concerns voir dire about tort reform. The ruling Thomas complains about originated in an omnibus motion in limine that Thomas herself filed. In it, Thomas moved for an order prohibiting "[a]ny and all reference, mention or citation to Tort Reform or 'Keep our Doctors in Nevada'" on the grounds these "are highly politicized topics . . . which do not have any bearing upon the ultimate issues in this trial."[2] Both WMC and Dr. Hardwick filed statements of nonopposition, agreeing with Thomas. Correcting her motion, Thomas filed a short reply asking to carve voir dire out of her proposed order in limine regarding tort reform.[3]

The issue came up briefly at the first of two pretrial conferences. At the conference, WMC offered the view that, "If [Thomas's lawyers] want to ask [prospective jurors] generally, do you have a problem in a malpractice case, do you believe that people can legitimately bring a malpractice case[ ], . . . I don't have a problem with it." But, WMC argued, "it's totally inappropriate to ask somebody how they voted on a referendum, and what they thought about the Keep our Doctors in Nevada referendum."[4] The

---

[2] "Keep Our Doctors in Nevada" or "KODIN" refers to a ballot initiative (the parties use referendum and initiative interchangeably, although initiative is the correct term) that voters passed in 2004 to limit medical malpractice claims. The initiative's changes to Nevada's medical malpractice law are codified in NRS Chapter 41A.

[3] We reject respondents' argument that the "invited error" doctrine bars Thomas's voir dire challenge. Thomas acted promptly to disabuse WMC and Dr. Hardwick of any misconception they had as to the intended scope of her motion in limine, and the district court went on to address Thomas's concern with having the blanket order in limine she had requested apply to voir dire. This distinguishes "invited error" cases like *Pearson v. Pearson*, 110 Nev. 293, 871 P.2d 343 (1994), in which the invited error was not timely and forthrightly corrected in the trial court.

[4] NRS 49.315 provides, "Every person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot unless the vote was cast illegally." Potential jurors do not surrender their rights as citizens on receipt of a summons calling them to jury duty. Even in an election law case, "[i]nquiry about political opinions and associations" has been held off limits unless "the particular juror had given some reason to believe, by his conduct or declarations, that he would regard the case as involving the interests of political parties rather than the enforcement of the law." 2 Charles Alan Wright, *Federal Practice and Procedure* § 382, at 513-14 (3d ed. 2000) (discussing *Connors v. United States*, 158 U.S. 408 (1895)).

district court partially agreed, cautioning the lawyers that it did not "want references to voting, to tort reform, [or] to Keep our Doctors in Nevada" in general voir dire. However, this was neither the blanket prohibition nor definitive ruling Thomas makes it out to be. The district court urged the lawyers instead to

> . . . [g]et it closer to the facts of this case. Do you have any strong feelings one way or the other about people who sue their doctor or their hospital and the claim that the doctor and the hospital caused them injury, the damage[?] Anybody who, for whatever reason in their life would not be able to be fair and impartial and listen to all the testimony[?] Those types of questions are fine.

By prior order, the district court had deferred final ruling on voir dire about medical malpractice reform "until filing of pre-trial statements and proposed *voir dire* questions." She reiterated that her final ruling would depend on the specific voir dire questions the lawyers proposed in their written pretrial statements:

> . . . if there's some questions that you feel are important to the fact pattern, if you put them in your pretrial statement . . . I will read those, and then we can talk about them or modify them as the Court might deem necessary.

The judge also invited sidebars at trial: "[I]f something comes up in jury selection, and any of you feel that there's a burning question that has to be asked that's a little bit broader, a little more political, ask for a sidebar, and we can talk about it."

This is all there is in the record on voir dire. No final written order was entered, the voir dire wasn't transcribed, and the appendix does not include the pretrial statements or any proposed written voir dire. The record contains no copies of advertisements or literature about medical malpractice tort reform, to which the venire might have been exposed, or proof of when and to what extent such literature was disseminated. At oral argument, Thomas's counsel acknowledged that she did not prepare and submit any proposed voir dire questions concerning medical malpractice reform, despite the district court's request for them.

Appellant has the responsibility to order the transcripts and assemble the record needed to decide the issues raised on appeal. *Cuzze v. Univ. & Cmty. Coll. Sys. of Nev.*, 123 Nev. 598, 603, 172 P.3d 131, 135 (2007) (citing NRAP 30(b)(3)). Not having voir dire transcripts hamstrings our review. *See Riggins v. State*, 107 Nev. 178, 182, 808 P.2d 535, 538 (1991) (declining to review an order refusing sequestered voir dire when the relevant transcripts were not ordered; if "the record on appeal . . . [does not] contain[ ] the material to which [the objecting party takes] exception . . . , the missing portions . . . are presumed to support the district court's

decision"), *reversed on other grounds Riggins v. Nevada*, 504 U.S. 127 (1992). Adhering to *Riggins*, we presume that the venire was asked the question the district court suggested ("Do you have any strong feelings one way or the other about people who sue their doctor or their hospital and the claim that the doctor and the hospital caused them injury?"), the related questions defense counsel suggested ("[D]o you have a problem in a malpractice case?"; "[D]o you believe that people can legitimately bring a malpractice case[ ]?"), and all appropriate follow-up.

In Nevada, the right to attorney voir dire is secured by statute. NRS 16.030(6), *discussed in Whitlock v. Salmon*, 104 Nev. 24, 752 P.2d 210 (1988). The scope of voir dire nonetheless "rests within the sound discretion of the district court, whose decision will be given considerable deference by this court." *Johnson v. State*, 122 Nev. 1344, 1354-55, 148 P.3d 767, 774 (2006). Cases elsewhere have taken varying positions on whether, to what extent, and when voir dire on tort reform and/or "the insurance crisis" is proper. *See* Richard L. Ruth, Annotation, *Propriety of Inquiry on Voir Dire as to Juror's Attitude Toward, or Acquaintance With, Literature Dealing With, Amount of Damage Awards*, 63 A.L.R. 5th 285 § 8 (1998 & Supp. 2010). The Utah, Idaho, and Pennsylvania cases on which Thomas relies do not license unlimited voir dire on medical malpractice reform, however. On the contrary, they support the parameters the district court set in this case—asking for specific questions to be submitted and justified, offering individual or even sequestered voir dire, and asking that the parties first explore jurors' general views on people who sue hospitals or doctors rather than framing the issue initially in political terms. These are all measures Thomas's cases permit, even encourage.[5]

Consider *Barrett v. Peterson*, 868 P.2d 96 (Utah Ct. App. 1993), for example. There, the plaintiffs lodged specific advertisements disseminated recently in the trial venue touting "tort-reform" and submitted 82 specific proposed voir dire questions, 11 of which were designed to elicit whether the venire had seen the ads and if so, what their feelings about them were. *Id.* at 97, 101. The trial court refused to permit these questions or, indeed, to

---

[5]We decline to adopt the rule stated in *Landon v. Zorn*, 884 A.2d 142 (Md. 2005), *abrogated on other grounds by McQuitty v. Spangler*, 976 A.2d 1020 (Md. 2009), on which WMC and Dr. Hardwick rely. Maryland follows a different approach to attorney voir dire than Nevada. In Maryland, attorney voir dire is limited to establishing bases for challenges for cause; " 'it does not encompass asking questions designed to elicit information in aid of deciding on peremptory challenges.' " *Id.* at 147 (quoting *Couser v. State*, 383 A.2d 389, 397 (Md. 1978)). Nevada recognizes that attorney voir dire legitimately informs a party's peremptory challenges. *Whitlock*, 104 Nev. at 28, 752 P.2d at 212-13.

allow the parties to even "verbalize the concept of lawsuits against doctors prompting discernible emotions." *Id.* at 103. This complete ban, the Utah court of appeals properly held, was error. *Id.* at 96.

In *Kozlowski v. Rush*, 828 P.2d 854 (Idaho 1992), by contrast, the plaintiffs failed to make a record that the jury venire likely had been exposed to assertedly widespread, current, but undocumented advertisements about a "medical malpractice crisis." *Id.* at 862-63. Had such exposure been documented, questions concerning individual juror's attitudes could have been appropriate. *Id.*[6] Since reversal was ordered for unrelated reasons, the court told the plaintiff to lay a proper foundation if she wished to explore attitudes toward malpractice reform on retrial. *Id.*

And the Pennsylvania case of *Capoferri v. CHOP*, 893 A.2d 133 (Pa. Super. Ct. 2006), was clarified in *Wytiaz v. Deitrick*, 954 A.2d 643 (Pa. Super. Ct. 2008). There, as here, the voir dire transcript was not available, but the record suggested that the trial judge planned to ask the venire for its opinions on civil damage suits and people who sue or are sued in medical malpractice cases. *Deitrick*, 954 A.2d at 647. Given that the potential jurors were asked "whether they had any specific beliefs about medical malpractice lawsuits or the parties involved in such litigation," *id.* at 648, the appellants' complaint that they didn't get the specific phraseology they wanted failed. Also significant in *Wytiaz*: the appellants "do not assert that they were prevented from questioning further any potential juror who answered one or more of the standard voir dire questions in a manner which might prompt additional inquiry." *Id.*

Based on the actual record, as distinguished from the parties' speculative characterizations of it, we find no abuse of discretion. Presumably, the district judge asked the venire the questions she said she planned to ask about "people who sue their doctor or their hospital and the claim that the doctor and the hospital caused them injury." Since Thomas did not submit any specific voir dire questions or have voir dire transcribed, we have no way of knowing whether the district court would have allowed the related question of whether the venire had been exposed to media on the subject of "people who sue their doctor or their hospital," assuming an adequate predicate was laid. *See supra* note 6. On this record, we assume the court did. What is presented, then, is a challenge to the district court's "failure to formulate more detailed questions

---

[6]Thomas did not submit any literature, initiative materials, or ads the jury may have been exposed to. The defense argued that the ballot initiative predated the trial by two years and people likely had no current memory of it. Without any concrete examples or proof—and no transcript of voir dire—the court has no way to assess the venire's exposure to tort reform literature except anecdotally.

on its own," after counsel declined—"hardly an abuse of discretion." *Chlopek v. Federal Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007).

## B. *Habit evidence*

Dr. Hardwick testified that he has worked in WMC's emergency room since 1980, through which approximately 70,000 patients pass each year. This works out to 200 patients a day of which, on average, one patient a day presents with chest pain complaints. While Dr. Hardwick did not remember seeing Ray Thomas on January 13, 2003, his hospital chart was in evidence. Dr. Hardwick testified to what the chart recorded, including his dictated notes stating that he urged Mr. Thomas to be admitted for further tests but Mr. Thomas refused. Over objection, Dr. Hardwick testified that he routinely urges patients with chest pain complaints and inconclusive test results like Mr. Thomas's to be admitted and that he routinely records this advice in dictation, as he did here. The attending emergency room nurse gave similar testimony about her handwritten chart notes. She testified without separate objection that in the 12 years she had worked with Dr. Hardwick in the emergency room, he "admits everyone" who presents with symptoms like Mr. Thomas's.

Thomas challenges the district court's admission of this evidence, citing NRS 48.059(1), but does not cogently establish error. NRS 48.059(1) provides that

> [e]vidence of the habit of a person or the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.[7]

Like many courts, "[w]e are cautious in permitting the admission of habit or pattern-of-conduct evidence under [NRS 48.059 or its federal analogue] Rule 406 because it necessarily engenders the very real possibility that such evidence will be used to establish a party's propensity to act in conformity with its general character," in violation of NRS 48.045, and may involve "collateral inquiries [that] threaten the orderly conduct of trial while potentially color-

---

[7]Although NRS 48.059(1) replicates Fed. R. Evid. 406, Nevada added subsection 2 from the draft Model Rules, which the Federal Rules omit. NRS 48.059(2) provides, "Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine."

ing the central inquiry and unfairly prejudicing the party against whom they are directed." *Simplex, Inc. v. Diversified Energy Systems, Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988). Nonetheless, NRS 48.059(1) deems evidence of habit or routine relevant and admissible to prove an act in conformity with the habit or routine, provided an adequate foundation is laid. For a general discussion of the different legislative approaches to habit evidence see 1 *McCormick on Evidence* § 195 (6th ed. 2006). The foundation requires that specific, recurring stimuli have produced the same specific response often and invariably enough to qualify as habit or routine. *Id.* § 195, at 784.

"Courts in many jurisdictions have allowed evidence of a medical practitioner's routine practice as evidence relevant to what the practitioner did on a particular occasion." *Aikman v. Kanda*, 975 A.2d 152, 164 (D.C. 2009) (collecting cases); *see* Annotation, *Propriety, in Medical Malpractice Case, of Admitting Testimony Regarding Physician's Usual Custom or Habit in Order to Establish Nonliability*, 10 A.L.R. 4th 1243 (1981). Proof that Dr. Hardwick, when confronted with an emergency room patient experiencing unexplained chest pains of nonmuscular origin, routinely counsels the patient to be admitted to the hospital for observation and further testing was relevant, as was his habit of dictating multiple chart notes over the course of a patient's visit to the emergency room. This was legitimate circumstantial evidence that, consistent with Dr. Hardwick's routine, he counseled Mr. Thomas to be admitted to the hospital, as his dictated notes record. *See Bloskas v. Murray*, 646 P.2d 907, 911 (Colo. 1982).

"Trial courts have considerable discretion in determining the relevance and admissibility of evidence." *Atkins v. State*, 112 Nev. 1122, 1127, 923 P.2d 1119, 1123 (1996), *overruled on other grounds by McConnell v. State*, 120 Nev. 1043, 102 P.3d 606 (2004). Although NRS 48.059(1) dispenses with the one-time common law requirement of corroboration, the fact the chart notes corroborate Dr. Hardwick's testimony as to his habit and routine makes Thomas's challenge to his testimony an especially hard sell. Much of Dr. Hardwick's testimony dealt with the chart notes as past recollection recorded evidence under NRS 51.125(2). To the extent Dr. Hardwick matched his recorded notes to the habit or routine they were shorthand for, the district court did not abuse its discretion in this case in admitting the testimony under NRS 48.059(1). *Atkins*, 112 Nev. at 1127, 923 P.2d at 1123 (reversal based on error in the admission or exclusion of evidence inappropriate absent "clear abuse" of discretion).

## C. Sanctions for lost original chart

Thomas next challenges the district court's refusal to impose preclusive or other significant sanctions on WMC for its negligence in having lost the original paper version of the emergency room chart. "[A] trial court's decision on whether to impose sanctions—including an adverse inference instruction—for the destruction or spoliation of evidence, is committed to the trial court's discretion." *Bass-Davis v. Davis*, 122 Nev. 442, 447, 134 P.3d 103, 106 (2006).

> [I]f the district court, in rendering its discretionary ruling on whether to give an adverse inference instruction [or to impose other sanctions] "has examined the relevant facts, applied a proper standard of law, and, utilizing a [demonstrably] rational process, reached a conclusion that a reasonable judge could reach," affirmance is appropriate.

*Id.* at 447-48, 134 P.3d at 106 (quoting *Garfoot v. Fireman's Fund Ins. Co.*, 599 N.W.2d 411, 416 (Wis. Ct. App. 1999)).

Some background helps give context to the sanctions dispute. Everyone, including Thomas, recognized the importance of the emergency room chart. Thomas obtained a copy of the chart from WMC before discovery and produced it at the early case conference. In the early case conference report, the parties agreed to Bates-number and use Thomas's copy of the chart as a master exhibit. In deposition, the individuals who made entries to the chart authenticated them. Although Thomas served requests for production on WMC that, if enforced, would have called for WMC to produce the original chart for inspection and fresh copying, to which WMC responded, no inspection occurred and no motion to compel was ever filed. The first firm trial date was continued to accommodate a conflict in Thomas's expert's calendar. Before the continuance, all parties had advised the court they were prepared to proceed with trial.

Just two weeks before the already-continued trial was set to begin, Thomas filed a motion to strike the defendants' pleadings and/or to exclude the master exhibit copy of the chart as evidence at trial. Thomas based her motion on an exchange of letters between WMC's and Thomas's lawyers, sent after discovery closed and the original trial had been continued, in which Thomas asked to see the original paper chart and WMC said it searched but could not find it. WMC attested to its practice of creating an electronic copy of its emergency room chart entries by scanning them at the end of each day. The hospital still had the electronic copies of the chart notes for January 13, 2003. Its risk manager had compared them to the original paper chart in 2005 when he verified WMC's

answers to Thomas's interrogatories and said the copies were the same.

At the hearing that followed, the court offered Thomas a trial continuance to develop what it deemed the speculative assertion that the paper original might differ from the master exhibit copy. Thomas declined the offered continuance. Over WMC's objection, the court ruled that Thomas could raise WMC's loss of the paper original as an issue at trial and, to facilitate that, ordered WMC to make its records custodian available to Thomas as a trial witness. Beyond these measures, the court denied further relief. The court based its decision on the fact that WMC had provided Thomas with a copy of the original chart early on; Thomas's delay in raising the issue, which the court took to mean Thomas herself saw no need to double check the master exhibit copy against the original; and the prejudice and confusion any other sanction would cause to WMC's co-defendant, Dr. Hardwick, who had never had custody of the original paper chart.

The district court did not abuse its discretion in declining preclusion sanctions and the adverse inference instruction Thomas proposed. The court in *Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 23 (1st Cir. 1981), faced similar competing policy concerns. In *Allen Pen*, one party sought a preclusion order and/or adverse inference instruction based on its opponent's destruction of certain documents after consulting them to answer interrogatories. *Id.* Unlike this case, where the chart was copied and the copies authenticated before the paper original was lost, no duplicates survived in *Allen Pen* (though the information could have been re-created in discovery from third parties). *Id.* As here, the sanctions proponent did not push to see the original documents or bring the matter to the trial court's attention until just before trial and then sought what amounted to liability-determining sanctions and/or an adverse inference instruction. *Id.* The district court denied the motion and the court of appeals affirmed. *Id.* at 23-24. It held that, under the circumstances, the sanctions proponent "seeks far too draconian a sanction. . . . Having failed to seek lesser remedies, it cannot wait for trial and then seek close to a declaration of victory on the issue." *Id.* at 23; *see JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 49-50 (1st Cir. 1999) (upholding order denying sanctions for destroyed evidence where the proponent delayed raising the issue until the eve of trial); *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999) (a party who waits an unreasonable period of time before moving to enforce discovery waives enforcement remedies).

This case presents a stronger case against reversal for failure to impose adequate sanctions than either *Allen Pen* or *Bass-Davis*. Here, the original chart was copied early on. All parties accepted

the copy as authentic. Thomas offered no evidence, only argument, to suggest the stipulated master exhibit copy was not an exact duplicate of the paper original; no motion to compel inspection of the original was made; Thomas, as the sanctions proponent, was not forced to trial minus otherwise unavailable evidence. As the trial court found, all parties, including Thomas, had agreed from the beginning that the master exhibit copy was authentic and Thomas had nothing to say it wasn't. *Compare Young v. Johnny Ribeiro Building*, 106 Nev. 88, 92, 787 P.2d 777, 779 (1990) (sanctions proponent proved the evidence had been materially altered, making it fair to assume other undetected alterations had occurred; with the "original" effectively unavailable, claim-terminating sanctions were appropriate whether or not "preceded by less severe sanctions"), *with Bass-Davis*, 122 Nev. at 446, 449, 455, 134 P.3d at 105, 107-08, 111 (reversing for failure to give an adverse inference instruction where a videotape was lost without being copied and noting that in that circumstance an adverse inference instruction is appropriate to " 'restor[e] the evidentiary balance' " (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991))).[8] Although the court offered Thomas a continuance so she could pursue discovery into the lost original and whether it might have varied from the electronic and other copies available, Thomas rejected this option. *Cf. DesRosiers v. Moran*, 949 F.2d 15, 22 (1st Cir. 1991) (declining to reverse order denying sanctions when the proponent elected to proceed to trial). Under these circumstances, the district court did not abuse its discretion in allowing Thomas to introduce evidence of WMC's negligent loss of the original chart but finding that more severe sanctions were unwarranted because waived.

## D. *Expert testimony/recall bias*

Thomas's final assignment of trial error concerns the general "recall bias" testimony presented by WMC's expert, Edward Panacek, M.D., M.P.H.[9] We reject this claim of error for two reasons. First, Thomas makes a different objection on appeal than the one she made—indeed, prevailed on—at trial. Second, even if error occurred in connection with Dr. Panacek's general testimony about recall bias, it does not rise to the level required to reverse.

" 'Recall bias' refers to the human tendency, when confronted with [a] rare outcome, such as the development of autism [after a

---

[8]Thomas also argues that the district court should have sanctioned WMC for its inability to produce a signed AMA release. However, unlike the chart, there was no evidence the AMA release ever existed in signed form.

[9]Dr. Panacek was designated primarily as an expert on emergency room medicine, a subject in which he is board certified and teaches. He also holds a Master's Degree in Public Health, with a subspecialty in epidemiology, which he also teaches. "Recall bias" is germane to epidemiology.

child is vaccinated], to recall with greater frequency or clarity events which may explain the outcome." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 601 n.62 (N.D. Fla. 2009). While expert testimony on recall bias has been permitted in the context of epidemiological challenges to the validity of retrospective public health studies, *see Colon v. Abbott Laboratories*, 397 F. Supp. 2d 405, 409-10 (E.D.N.Y. 2005), we have found no published case approving its admission on individual witness credibility, and *Nichols v. American National Insurance Co.*, 154 F.3d 875, 882-83 (8th Cir. 1998), persuades us that such use of recall bias testimony invades the province of the jury and seems unhelpful.[10] We thus decline respondents' invitation to equate recall bias testimony with the cross-cultural eyewitness identification testimony we permitted in *Echavarria v. State*, 108 Nev. 734, 839 P.2d 589 (1992).

On appeal, Thomas objects to Dr. Panacek's general testimony about recall bias on the grounds that it amounted to an improper, thinly veiled comment on her credibility as a witness. Thomas's problem is that she did not timely raise or preserve this objection in the trial court. While Thomas mentioned recall bias in her omnibus motion in limine, she gave it just a single paragraph, stating "Dr. Panacek is a medical doctor and an expert in Emergency Room medicine [and h]e is not qualified to testify regarding a subject called 'recall bias,' which is not even subject to expert application." Fairly read, this objection went to Dr. Panacek's qualifications to give recall bias testimony, not its helpfulness. Because the trial court properly declined to give a definitive ruling on this sketchy objection (which appears invalid in any event—Dr. Panacek's master's in Public Health qualified him on recall bias, *see supra* note 9), the contemporaneous objection rule required Thomas to object at trial. *See Richmond v. State*, 118 Nev. 924, 929-32, 59 P.3d 1249, 1252-54 (2002); NRS 47.040(1).

Thomas did not renew her motion in limine or ask the court to exclude all testimony about recall bias before Dr. Panacek testified, as our dissenting colleague would find. Before Dr. Panacek was called, Thomas reminded the court and opposing counsel that the section of her motion in limine concerning Dr. Panacek remained unresolved in several respects, recall bias being one. She did not renew her motion in limine or ask for an order forbidding reference to recall bias. Instead, Thomas affirmatively advised that she might well have no objections to Dr. Panacek being asked about re-

---

[10]Applying *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), *Nichols* also concludes such testimony is neither reliable nor relevant and therefore inadmissible as expert testimony. Although *Higgs v. State*, 126 Nev. 1, 17, 222 P.3d 648, 658 (2010), adopts a more deferential and flexible standard than *Nichols* did in applying *Daubert*, it appears doubtful that "recall bias" testimony qualifies as providing "assistance" under *Higgs*.

call bias, depending on what was asked and the foundation laid. Per Thomas, WMC's counsel "is a very experienced and skillful lawyer [who] knows how to phrase a question . . . we're just going to have to wait and see whether the question occurs to any of us as being objectionable. It may not be."

On appeal Thomas challenges the district court's admission of *any* testimony on the subject of recall bias. But as noted, this was not the objection in the omnibus motion in limine or in the colloquy that preceded Dr. Panacek's testimony. True to her stated position in the trial court, Thomas allowed Dr. Panacek to testify for five pages about recall bias, in general, and its application to epidemiology and bad medical outcomes, in particular, without objection. It was only when Dr. Panacek was asked if he had "an opinion . . . to a reasonable medical probability that recall bias is involved" in this case that Thomas objected.

When Thomas finally objected, the court called a recess. After the jury was excused, Thomas volunteered that she had made a deliberate, tactical decision not to object to the general recall bias testimony "because it's general information that really isn't anything that we all don't know." Thomas stated that her objection was to Dr. Panacek tying recall bias to the facts in this case, which Thomas argued was more prejudicial than probative and a comment on Thomas's credibility, invading the province of the jury. The court sustained Thomas's objection to the question asked before the recess—whether Dr. Panacek had an opinion about recall bias being involved in the case. However, the court stated that it would overrule the objection to recall bias testimony in general. But this latter ruling was gratuitous because by then the general recall bias testimony had been admitted without objection and Thomas's counsel had stated that he didn't deem the general testimony harmful or even objectionable. Following the break, defense counsel spent only two pages on recall bias and covered nothing that hadn't already been covered without objection in greater detail before the break.

 █

NRS 47.040(1)(a) requires a party who objects to the admission of evidence to make "a timely objection or motion to strike . . . , stating the specific ground of objection." The "failure to specifically object on the grounds urged on appeal preclude[s] appellate consideration on the grounds not raised below." *Pantano v. State*, 122 Nev. 782, 795 n.28, 138 P.3d 477, 486 n.28 (2006). "This rule is more than a formality," since an objection educates both the trial court and the opposing party, who is entitled to revise course according to the objections made. 1 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, *Federal Rules of*

*Evidence Manual* § 103.02[9], at 103-18 (9th ed. 2006). Where, as here, an objection was stated as to certain evidence but not to other related evidence, and this was confirmed on the record to be the product of deliberate choice, "[t]here is no reason . . . to allow reconsideration of this strategic choice on appeal." *Id.*

We agree with the dissent that it can be argued that there isn't much difference between general questions about recall bias and the question that would have tied the concept to this case directly. *See Townsend v. State*, 103 Nev. 113, 118-19, 734 P.2d 705, 709 (1987). That argument is off limits to Thomas here, though, given her failure to timely object to the testimony about recall bias in general, her lawyer's affirmation that such a difference did exist and was the crux of the matter, and the frank, on-the-record acknowledgment that the effect of the general recall bias testimony was negligible. Certainly, on this record, the error in allowing the general testimony about recall bias cannot qualify as plain. *See Lioce v. Cohen*, 124 Nev. 1, 16, 174 P.3d 970, 980 (2008); NRS 47.040(2); *see also United States v. Yu-Leung*, 51 F.3d 1116, 1121-22 (2d Cir. 1995) (a decision not to raise an objection for strategic reasons amounts to waiver, not merely forfeiture, and is not reviewable even for plain error (discussing *United States v. Olano*, 507 U.S. 725 (1993))).[11]

E. *Dismissal of Brandi Thomas's claims*

The district court dismissed the amended complaint naming Brandi Thomas as an additional party plaintiff based on the statute of limitations in NRS 41A.097(4). On appeal, Brandi Thomas seeks to challenge the dismissal on constitutional and "relation

---

[11]Even crediting arguendo the dissent's finding of preserved error as to the general recall bias testimony, we cannot agree that the error "so substantially affected [appellant's] rights that it could be reasonably assumed that if it were not for the alleged error[ ], a different result might reasonably have been expected," which is required to prevail on harmless error review. *El Cortez Hotel, Inc. v. Coburn*, 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971). Reason to question Thomas's memory of the emergency room visit existed separate and apart from Dr. Panacek's recall bias testimony, in her testimony that aspirin wasn't administered when the record shows it was and her deposition testimony that she wasn't given papers to take home which she later located and produced. *See* 21 C. Wright & K. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5035.2, at 630-34 (2d ed. 2005) (that evidence is cumulative of other properly admitted evidence suggests the error may be harmless). Given Thomas's trial court admission that the general recall bias testimony was "information that really isn't anything that we all don't know" and the weight of the other evidence favoring the jury's finding of no negligence, we find the error, even if preserved, to have been harmless.

back'' grounds. The district court did not address either challenge, because they weren't raised until a motion for reconsideration was filed. Citing *Moore v. City of Las Vegas*, 92 Nev. 402, 405, 551 P.2d 244, 246 (1976), the district court denied reconsideration because this was not one of the ''rare instances in which new issues of fact or law are raised supporting a ruling contrary to the ruling already reached.'' Since the district court denied the motion for reconsideration for procedural reasons and not on its merits, *Arnold v. Kip*, 123 Nev. 410, 168 P.3d 1050 (2007), is not of help. And, while we have reached constitutional issues not addressed by the district court, *Barrett v. Baird*, 111 Nev. 1496, 1500, 908 P.2d 689, 693 (1995), *overruled on other grounds by Lioce v. Cohen*, 124 Nev. 1, 174 P.3d 970 (2008), it does not appear appropriate to do so in this case.

We therefore affirm.

PARRAGUIRRE, C.J., and HARDESTY, DOUGLAS, SAITTA, and GIBBONS, JJ., concur.

CHERRY, J., concurring in part and dissenting in part:

The majority rejects Thomas's argument that the district court materially prejudiced her case by allowing any testimony regarding so-called recall bias, concluding that Thomas did not object to the recall bias testimony proffered and that, at any rate, the district court's error in allowing the testimony was harmless. But in so concluding, the majority gives short shrift to the nature of recall bias evidence in the context of this case, where only Thomas's credibility was implicated by the recall bias testimony, and the record of Thomas's repeated objections to any such testimony. I would reverse the district court's judgment based on this issue, and thus, I dissent from that aspect of the majority's decision.

As the majority notes, recall bias is typically implicated in large-scale research studies. For instance, in a study of the effects of a certain pharmaceutical drug on a particular segment of the population, recall bias refers to the tendency of research subjects who experience a negative outcome such as cancer or a birth defect to ''recall,'' inaccurately, that they have been exposed at an earlier time to a suspected or known causal factor of the outcome. As one magazine article appended to a federal court of appeals opinion noted with regard to studies of the connection, if any, between a prenatal pharmaceutical and birth defects, ''[w]omen with normal babies may forget they took the drug and those with malformed babies may be more likely to remember—or vice versa. The bias is essentially unmeasureable.'' *McBride v. Merrell Dow and Pharmaceuticals Inc.*, 717 F.2d 1460, 1468 (D.C. Cir. 1983). The implication is that research subjects who experience a negative outcome may be unreliable with regard to whether they were ex-

posed to a suspected causal factor. While the notion of recall bias might be useful in assessing the validity of large-scale research studies, applying it to an individual impermissibly invades the jury's role of evaluating witness credibility.

When, as here, liability turns on a single witness's credibility, allowing recall bias testimony effectively constitutes permitting an expert to assess the individual witness's credibility, the result of which likely is a different verdict than reasonably might have been expected if the testimony had been precluded. *See El Cortez Hotel, Inc. v. Coburn*, 87 Nev. 209, 213, 484 P.2d 1089, 1091 (1971). Since Thomas offered the primary testimony as to causation in this case, Dr. Panacek's recall bias testimony, even though stated in general terms, amounted to testifying as to Thomas's credibility. That is, because only Thomas experienced a negative outcome—specifically, her husband's death—the recall bias theory discussed by Dr. Panacek necessarily must have been connected to Thomas's testimony as to this fundamental issue, suggesting that her testimony was not credible. The majority agrees that there is little difference between general questions about recall bias and the question that would have tied the concept directly to this case, *ante* at 14 (citing *Townsend v. State*, 103 Nev. 113, 118-19, 734 P.2d 705, 709 (1987)), but refuses to address the problem because the majority believes Thomas failed to raise a contemporaneous objection to Dr. Panacek's recall bias testimony.

But Thomas objected to such evidence at least four times before the district court decided to address the issue, and a fifth time during the same colloquy out of which the majority selects two statements to conclude that Thomas waived any objection. Thomas first objected to all recall bias testimony through a motion in limine to exclude any such testimony from being offered at trial. The majority dismisses the motion-in-limine objection as merely objecting to Dr. Panacek's qualifications to give recall bias testimony, not to recall bias testimony itself. But the majority ignores the import of Thomas's motion-in-limine argument that recall bias "is not even subject to expert application"—an objection, not to Dr. Panacek's qualifications, but to the general subject of recall bias. Indeed, Thomas supported her statement with a citation to *Santillanes v. State*, 104 Nev. 699, 765 P.2d 1147 (1988), in which this court recognized that the admissibility of scientific evidence depends on its trustworthiness and reliability, indicating that Thomas questioned the substance of recall bias evidence. Undoubtedly, then, Thomas was objecting to the admission of any recall bias testimony based on lack of reliability and trustworthiness, not based on Dr. Panacek's qualifications to testify about it, as the majority contends.

The district court deferred ruling on that aspect of Thomas's motion in limine until the pretrial conference. At the pretrial con-

ference, Thomas again objected to the presentation of any recall bias testimony, but the district court deferred ruling on the objection until trial. At trial, just before Dr. Panacek was called to testify, Thomas objected a third time. On the district court's inquiry as to any outstanding motion-in-limine issues regarding Dr. Panacek, Thomas reminded the court that it had yet to rule regarding "the recall bias testimony of Dr. Panacek" and his correspondingly "speculating on [Thomas's] state of mind" at the time of the events at issue. The district court again deferred ruling on the issue, explaining that it needed to first hear the testimony. When Dr. Panacek began his testimony regarding recall bias, Thomas did not raise her fourth objection until respondents asked Dr. Panacek whether recall bias was a factor in this case. A colloquy outside of the jury's presence followed, during which the district court sustained Thomas's objection to Dr. Panacek tying recall bias to Thomas, but overruled her objection to Dr. Panacek's more general recall bias testimony.

In the face of Thomas's numerous objections to any recall bias testimony, the majority nonetheless affirms based on two statements that Thomas made. First, during Thomas's third objection, when Thomas objected during trial, just before Dr. Panacek testified, she stated that she would "wait and see" whether the questions posed to Dr. Panacek were objectionable. Second, during the colloquy after Thomas's fourth objection to any recall bias testimony, Thomas offered that she intentionally did not object at the time Dr. Panacek began to testify regarding recall bias testimony because she did not find general recall bias testimony objectionable. But the majority fails to mention that moments later, during that same colloquy, Thomas made a fifth objection to any recall bias testimony being offered, stating that because "only plaintiffs have any recall in this case[, e]ven the general information is prejudicial [and] without probative value."

And regardless of the two statements on which the majority relies, Thomas's third objection, raised before Dr. Panacek began testifying, certainly constitutes the contemporaneous objection necessary to preserve this issue for appeal. See Richmond v. State, 118 Nev. 924, 929-32, 59 P.3d 1249, 1252-54 (2002). After the district court deferred ruling on Thomas's objection as to the admissibility of recall bias testimony a third time, explaining that it needed to first hear the testimony, the district court was at least implicitly, if not explicitly, ruling that it would admit general testimony regarding recall bias. Given that the district court repeatedly refused to rule on Thomas's objections until finally deciding the issue during the colloquy, it is unclear what else Thomas could have done without alienating the jury. See Bocher v. Glass, 874 So. 2d 701,

704 (Fla. Dist. Ct. App. 2004) (recognizing that counsel risks alienating the jury with repeated objections). Even the district court was convinced that the objection had been preserved, as evidenced by the district court assuring Thomas that she had, in fact, preserved for appeal·her objection to the recall bias testimony. Considered along with Thomas's first four objections, the record demonstrates that Thomas sufficiently preserved the issue despite the two inconsistent statements made during her third and fourth objections to recall bias testimony.

The majority fails to appreciate the substantial prejudicial effect of permitting even general recall bias testimony that directly implicated Thomas's right to have a jury resolve the issue of her credibility and correspondingly declines to discuss that issue based on an incomplete analysis of the extent to which Thomas attempted to preclude any recall bias testimony from the trial and preserve the issue for appeal; I therefore respectfully dissent from that portion of the majority's decision concluding that Thomas failed to preserve the admissibility issue for appeal and that, even if she had, allowing the recall bias testimony was merely harmless error. Had the district court properly precluded the presentation of this recall bias testimony, a different result reasonably might have been reached and the judgment should thus be reversed.

The district court abused its discretion by allowing any testimony whatsoever regarding recall bias. The correct and prudent action would have been to disallow any and all testimony concerning recall bias because such testimony, whether generally presented or specifically related to this case, in which only Thomas's credibility was at issue, invades the province of the jury and is definitely prejudicial. In light of the above, I respectfully dissent and would award Thomas a new trial free of any mention of recall bias.