No. 126,575

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMIAH IJL IVY,
*Appellant*.

SYLLABUS BY THE COURT

1.

To determine whether someone has a reasonable expectation of privacy under K.S.A. 21-6101(a)(8), the finder of fact considers: (1) whether the person subjectively believes they have an expectation of privacy in the situation, and (2) whether a reasonable person in the same or similar circumstances would have an objective expectation of privacy.

2.

Private telephones play a vital role in private communication, including private conversations and their 21st century equivalent, private text messaging.

3.

In deciding whether an action is subjectively or objectively reasonable, context is key, and the finder of fact is in the best position to make such a determination.

4.

The constitutional right to be present emanates from the Sixth Amendment right to confront witnesses and from the right to due process guaranteed under the Fifth and Fourteenth Amendments.

Appeal from Johnson District Court; ERICA K. SCHOENIG, judge. Oral argument held February 4, 2025. Opinion filed April 11, 2025. Conviction affirmed, sentence vacated, and case remanded with directions.

*Lindsay Kornegay*, of Kansas Appellate Defender Office, for appellant.

*Jacob M. Gontesky*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, P.J., BRUNS and PICKERING, JJ.

ARNOLD-BURGER, J.:  A jury convicted Jeremiah IJL Ivy of one count of breach of privacy for sharing a sexually explicit video that his ex-girlfriend, S.P., recorded during their relationship. Ivy now appeals, raising several claims of error:  (1) sufficiency of the evidence proving S.P. had a reasonable expectation of privacy to support the breach of privacy conviction; (2) prosecutorial error based on "golden rule" violations; (3) violation of the right to be present at trial; (4) cumulative error; and (5) improper awarding of jail credit. After reviewing these issues upon the record presented, we affirm his conviction, but vacate his sentence, and remand for calculation of the proper amount of jail credit.

FACTUAL AND PROCEDURAL HISTORY

The facts here are largely undisputed. Given the issues presented on appeal, we need not recount the evidence in detail.

2

Ivy and S.P. were in an off-and-on romantic relationship for three years. They share a child. In October 2018, S.P. recorded a video of herself performing oral sex on Ivy in the home they shared, on her phone, which she then sent him through text message. Although she said nothing to Ivy about limiting further sharing of the video, S.P. believed the video was "personal and private" and that there was an implication he would not publicly share the video with anyone because they had created similar videos in the past.

Ivy and S.P. permanently ended their relationship in March 2020. S.P. blocked his number and his social media accounts. At no point did S.P. tell Ivy to delete the video. Then, in June 2020, S.P. began receiving text messages from various numbers, which she believed came from Ivy based on the contents of the messages. One day, S.P.'s sister contacted her to inform her that Ivy had shared a video of S.P. performing oral sex on Ivy on his Snapchat. S.P.'s sister also provided a screen recording of the video on Ivy's Snapchat. S.P. contacted the police, which ultimately led to the State charging Ivy with one count of breach of privacy under K.S.A. 21-6101(a)(8).

At the close of the State's presentation of evidence to the jury, Ivy moved for a judgment of acquittal arguing that there was no evidence S.P. had a reasonable expectation of privacy in the video. The district court denied Ivy's motion, finding the State had presented a prima facie case to submit the fact question to the jury. The jury convicted Ivy as charged and made a domestic violence finding as well.

Ivy timely filed written motions for a judgment of acquittal and new trial. After a hearing, the district court first denied Ivy's motion for acquittal, concluding that there was sufficient evidence presented at trial to establish S.P. had a reasonable expectation of privacy in the video. In reaching that conclusion, the court applied a two-prong test adopted in this court's decision in *State v. Hayes*, 57 Kan. App. 2d 895, 462 P.3d 1195 (2020) (considering [1] whether the alleged victim had a subjective expectation of

3

privacy under the facts of the case, and [2] whether a reasonable person would have had an objective expectation of privacy under similar circumstances).

As for Ivy's motion for new trial, the district court agreed that the prosecutor had committed so-called "golden rule" violations by making certain statements during closing, but concluded those errors were harmless. The court further found that Ivy's argument about plexiglass panels and a stationary lectern in the courtroom preventing the jury from seeing him did not rise to the level of a violation of his constitutional right to be present at trial. Thus, the court denied Ivy's motion for new trial.

At sentencing in June 2023, the district court noted that Ivy's criminal history score placed him in the presumptive prison category for his crime of conviction and also required application of a special rule mandating consecutive sentencing. The court also noted that at the time of the offense Ivy was on bond in Jackson County, Missouri case No. 2116-CR-00839-01—in which Ivy faced a four-year prison sentence for convictions of voluntary manslaughter and child abuse. The court also noted that Ivy "should receive credit" for 257 days in jail based on the presentence investigation report but explained "he may not get all of that credit on this case if the sentences run consecutively to either the 18DV1711 case or the Jackson County case."

As to the breach of privacy conviction in the current case, the court imposed the presumptive 21-month prison sentence. The court also found the breach of privacy conviction constituted a probation violation and revoked Ivy's probation in the other case, ordering the current sentence to run consecutive to the underlying six-month jail sentence. The court also ordered the current sentence to run concurrent with the sentence in the Jackson County case. The court did not specify an amount of jail credit awarded to Ivy, either from the bench or on the sentencing journal entry.

Ivy timely appealed. Additional facts will be added as necessary.

4

I.  THERE WAS SUFFICIENT EVIDENCE TO SUPPORT A BREACH OF PRIVACY CONVICTION

Ivy challenges the sufficiency of the evidence supporting his breach of privacy conviction but focuses his argument solely on the element of the offense requiring the State to prove S.P. had an objectively reasonable expectation of privacy in the sexually explicit video Ivy shared on his Snapchat story. See K.S.A. 21-6101(a)(8).

The well-known standard of review for a sufficiency of the evidence challenge requires this court "review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). But in conducting that review, this court does not reweigh evidence, resolve conflicting evidence, or make credibility determinations. 313 Kan. at 209. "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Additionally, because resolving this issue requires it, this court conducts an unlimited review to interpret the statutory language of the offense. See *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). And the most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be established. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022). This court must first attempt to determine legislative intent though the statutory language enacted, giving common words their ordinary meanings 315 Kan. at 698. Unless the statute is ambiguous, courts need not resort to canons of statutory construction or legislative history to determine the legislative intent. *Betts*, 316 Kan. at 198.

The relevant statute is K.S.A. 21-6101(a)(8) which defines breach of privacy as

"knowingly and without lawful authority:

. . . .

"(8) disseminating any videotape, photograph, film or image of another identifiable person 18 years of age or older who is nude or engaged in sexual activity and *under circumstances in which such identifiable person had a reasonable expectation of privacy*, with the intent to harass, threaten or intimidate such identifiable person, and such identifiable person did not consent to such dissemination." (Emphasis added.)

The statute does not define "reasonable expectation of privacy," and the only Kansas appellate decision to discuss its meaning is *Hayes*, 57 Kan. App. 2d at 898-99. That case involved a different provision of the breach of privacy statute which, at the time, prohibited secretly recording a video of another person who is nude or in a state of undress "'under circumstances in which that other person has a *reasonable expectation of privacy*.'" 57 Kan. App. 2d at 898; see K.S.A. 2014 Supp. 21-6106(a)(6). Hayes filmed his neighbor from outside her window as she laid on her bed wearing only her underpants.

Because "reasonable expectation of privacy" is not defined in the statute, and no existing caselaw was directly on point, this court turned, in part, to Fourth Amendment jurisprudence for guidance. 57 Kan. App. 2d at 900-01. In determining the reasonableness of a person's belief, it noted that courts look—in other contexts, *like* the Fourth Amendment context and the self-defense context—to both a subjective and an objective component. But this court also cautioned that "[t]he Fourth Amendment is distinct from the right to privacy. It 'protects individual privacy against certain kinds of governmental intrusion, but its protections go further, and often have nothing to do with privacy at all.' [Citation omitted.]" 57 Kan. App. 2d at 900.

6

Still, this court held a two-part analysis for assessing a victim's reasonable expectation of privacy could be gleaned from such jurisprudence. See 57 Kan. App. 2d at 900-01. Under that test—which Ivy asks this court to apply—the fact-finder must consider: (1) whether S.P. had a subjective expectation of privacy under the circumstances, and (2) whether a reasonable person in the same or similar circumstances would have an objective expectation of privacy. Though this court is not bound by decisions of prior panels, we adopt this two-prong analysis and apply it here because it is well-reasoned and neither party objects to its application. See *State v. Fleming*, 308 Kan. 689, 706, 423 P.3d 506 (2018).

Under the first prong, Ivy appears to concede that S.P. had a subjective expectation of privacy under the circumstances because he makes no attempt to challenge that point in his brief. *Meggerson*, 312 Kan. at 246 (points raised incidentally in an appellate brief and not argued therein are deemed waived or abandoned). Even if Ivy had addressed this point, there is ample evidence in the record from which a rational fact-finder viewing the evidence in the light most favorable to the State would conclude that S.P. had a subjective expectation of privacy under the circumstances. S.P. testified that she only filmed and shared the video with Ivy because they were in a romantic relationship at the time, and she considered the video to be "personal and private." She did not permit Ivy to share the video, and she felt "betrayed" after seeing it on his Snapchat. S.P. did not film the video with the expectation that it would be shared publicly on social media, let alone played in a courtroom. S.P. never explicitly asked Ivy not to share the video because they had created other videos together, so there was "already an implication that we keep it between us." Based on this evidence, there was substantial evidence to show that S.P. had a subjectively reasonable expectation of privacy in the contents of the video.

Ivy instead focuses on the second prong, arguing no reasonable person would have an *objectively* reasonable expectation of privacy under the circumstances. Ivy asserts this

7

prong "appears to directly parallel the Fourth Amendment test for standing," and then provides examples of Kansas and United States Supreme Court decisions discussing how defendants have no legitimate expectation of privacy in information voluntarily surrendered to third parties. See *Smith v. Maryland*, 442 U.S. 735, 744, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (finding that person has no legitimate expectation of privacy against government intrusion when he voluntarily allows the telephone company to track his phone calls); *State v. Scheuerman*, 314 Kan. 583, 595, 502 P.3d 502 (2022) (concluding defendant lacked standing to challenge search of a vehicle in which he was merely a passenger and not an owner).

As applied here, Ivy contends there was no objectively reasonable expectation of privacy because S.P. voluntarily sent the video to a "third party" and therefore would have lacked standing to challenge a search of Ivy's cellphone. It is unclear who Ivy identifies as the "third party" in this case. In his appellate brief, he points to law enforcement. He contends that because a law enforcement agency could search his phone upon obtaining a warrant or he could voluntarily show videos on his phone to law enforcement, then S.P. could not establish any objectively reasonable expectation of privacy. Yet he also suggests that because S.P. had no access or control over his phone, he could physically show the videos to anyone he wanted. But just because he had the ability to show the videos on his phone to third parties does not mean that S.P. had no objectively reasonable expectation that he would not share them. There was no third-party disclosure by S.P. here. There are only two principals, S.P. and Ivy.

Moreover, by directly connecting the objectively reasonable standard with specific Fourth Amendment caselaw Ivy takes his analysis of the second prong of the *Hayes* test a step too far, a step that the panel in *Hayes* was unwilling to take. See *Hayes*, 57 Kan. App. 2d at 900. The Fourth Amendment protects the people from the invasion of their privacy by government actors. It does not apply to the distribution of material between private actors—consensual or otherwise. The third-party doctrine, upon which Ivy relies

8

here, is a uniquely Fourth Amendment concept that a person has no reasonable expectation of privacy—as it relates to government action—to information voluntarily turned over to third parties. See *State v. Schultz*, 252 Kan. 819, 823-24, 850 P.2d 818 (1993).

We find *Katz v. United States*, 389 U.S. 347, 352, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), informative. The United States Supreme Court was faced with an argument that by going into a phone booth to make his call, Katz had given up his right to privacy in the conversation, allowing the FBI to record his call on an electronic listening device attached to the outside of the phone booth. The Supreme Court pushed back on the prosecution's interpretation that the conversation was no longer private by pointing out the role the public telephone plays in private communication.

"The Government stresses the fact that the telephone booth from which the petitioner made his calls was constructed partly of glass, so that he was as visible after he entered it as he would have been if he had remained outside. But what he sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear. He did not shed his right to do so simply because he made his calls from a place where he might be seen. No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." 389 U.S. at 352.

Private telephones also play a vital role in private communication, including private conversations and their 21st century equivalent, private text messaging.

We have not been provided with any caselaw that we are able to conclude supports Ivy's position that, as a matter of law, private intimate photos shared by intimate partners

9

are not objectively private because they were sent over the internet or telephone line from one principal to another principal. In deciding whether an action is subjectively or objectively reasonable, context is key, and the finder of fact is in the best position to make such a determination.

> "Consent to share information in one context does not serve as consent to share this information in another context. When a person gives her credit card to a waiter, she is not consenting to let the waiter use that card to make personal purchases. When a person entrusts a doctor with sensitive health information, he is not authorizing that doctor to share that information with the public. What lovers share with each other is not equivalent to what they share with coworkers, acquaintances, or employers. Consent is contextual; it is not an on/off switch." Citron & Franks, *Criminalizing Revenge Porn*, 49 Wake Forest L. Rev. 345, 355 (2014).

The question here is not whether the government unreasonably searched a cellphone to discover incriminating information about S.P. or Ivy; instead, this court must determine whether the jury erred in concluding that it was objectively reasonable for someone to expect a romantic partner not to publicly disseminate a video depicting the former couple engaging in private sexual activity after the relationship ended without the consent of one of the participants.

With that clarification in mind, we cannot say that S.P. had no objectively reasonable expectation of privacy under the circumstances. S.P. recorded a video of private and consensual sexual activity between herself and Ivy within the context of their romantic relationship at the time. The video was recorded in the home they previously shared, while nobody else was present. Though S.P. shared the video from her private telephone with Ivy and did not explicitly preclude him from further distribution at the time, the evidence showed that she shared it with Ivy *alone* based on an implication that the video would remain private. Though Ivy does not specifically address it, the fact that S.P. and Ivy were no longer dating and S.P. had blocked communication from Ivy when

10

he publicly shared the video on his Snapchat account is significant. A reasonable person in similar circumstances would not expect to surrender their privacy about such intimate matters simply because the picture is sent over their private telephone line, or the relationship ends.

When viewing the evidence in a light most favorable to the State, a rational fact-finder could have found that a reasonable person in similar circumstances to S.P. would have an expectation of privacy. As a result, we find the State presented sufficient evidence for the jury to find Ivy guilty of breach of privacy.

II. THE DISTRICT COURT DID NOT ERR IN FINDING PROSECUTORIAL ERROR WAS HARMLESS

Ivy next argues the prosecutor erroneously made "'golden rule'" arguments during closing arguments which denied him a fair trial and requires reversal of his conviction. "A 'golden rule' argument . . . is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members." *State v. Lowery*, 308 Kan. 1183, Syl. ¶ 5, 427 P.3d 865 (2018). Such an argument is "generally improper because it encourages the jury to decide the case based on personal interest or bias rather than neutrality." 308 Kan. 1183, Syl. ¶ 5. A prosecutor should also refrain from making statements that seek "to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law." 308 Kan. 1183, Syl. ¶ 5.

We turn to the prosecutor's comments at issue here, which were made in rebuttal.

"How would you feel if we would go with the defense's logic? You send a video of your children in the bathtub, are you then expected to accept if that video shows up on the dark Internet? Are you supposed to sit back and take it because, well, you shared the

11

video? That's why this law was enacted. That's why we're here. If this was not a crime, the defendant wouldn't have been charged."

Shortly after, the prosecutor stated:

"There's no world where sharing a video takes away every semblance of privacy, and especially something so private as this, an intimate sexual moment with your partner at the time. It shouldn't have to be said to an intimate partner, please delete this video. Please don't share this video. You don't do that in real life. Please don't tell people I'm in the shower. Please don't take pictures of me in the shower when you're with your significant other, because it's just common sense. This is not okay."

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Both parties begin by discussing the first step of the analysis, but we need not discuss whether the prosecutor's statements amounted to error because the district court ruled in Ivy's favor by finding that the statements were erroneous. The State asserts this court "should not be so quick" to find the prosecutor's statements were error because the

12

prosecutor was merely using the defense's logic to rebut similar statements made by Ivy's counsel. But this court can decline to consider the State's arguments on this prong because the State failed to cross-appeal the district court's adverse ruling. See K.S.A. 2024 Supp. 60-2103(h) (appellee must file notice of cross-appeal to obtain appellate review of adverse rulings); *State v. Crawford*, 300 Kan. 740, 750, 334 P.3d 311 (2014) (declining to review finding of prosecutorial misconduct and moving straight to harmlessness inquiry).

So moving directly to the reversibility inquiry, the State offers several reasons why the prosecutor's statements had no reasonable possibility of affecting the jury's verdict. First, the State points out that Ivy did not contemporaneously object at trial, which "indicates the argument was never so egregious as to draw the ire of defense counsel or the trial court judge." Although Ivy was not required to object at trial to preserve the issue for appeal, failing to object is a relevant consideration when conducting the harmlessness inquiry. See *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

The State also correctly notes that the district court had given several jury instructions immediately before closing arguments that accurately described the jury's role to determine Ivy's guilt based on the evidence and law as given in the instructions. See *State v. Brown*, 316 Kan. 154, 170, 513 P.3d 1207 (2022) ("Appellate courts often weigh these instructions when considering whether any prosecutorial error is harmless. In doing so, we presume the jurors follow the instructions."). There is no sign that the jury abdicated its duty to follow the instructions, so this court could presume it disregarded any erroneous statements made by the prosecutor, which also weighs in the State's favor. In other words, these considerations weigh in the State's favor.

The State also asserts the prosecutor's statements were "brief and not repeated" and "not borne of ill-will or otherwise egregious." Although the former description of the

13

statements being "brief and not repeated" is not entirely accurate—given they took up over half of the State's rebuttal portion—the latter description is correct. As the State explains, the prosecutor was merely responding to the defense's similar statements about the implications of willingly sharing digital media and made no other statements up to that point that were found to be golden rule violations. Yet, contrary to the State's point, "'a prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by defense counsel.'" *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct); see also *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015) ("'The open-the-door rule does not insulate a prosecutor from a finding of misconduct.'").

Even so, we agree with the State and find that there is no reasonable possibility that the prosecutor's erroneous statements contributed to the jury's verdict. As the State notes, and as explained above, the only contested element of the offense was whether S.P. had an expectation of privacy under the circumstances and there was sufficient evidence to support this element. The prosecutor's erroneous statements were made in the context of refuting the defense's faulty premise that a person's expectation of privacy "dwindles" once someone records a video of a private moment or shares that same recording with a romantic partner. The prosecutor's latter statements about asking a romantic partner to delete or not share such videos also directly reflected S.P.'s testimony that she and Ivy had an implied understanding not to publicly share the videos they created together privately.

For these reasons, we find the State has proven beyond a reasonable doubt that the prosecutor's statements were harmless and did not affect the outcome considering the entire record.

14

III.    THE COURTROOM SETUP DID NOT VIOLATE IVY'S RIGHT TO BE PRESENT AT TRIAL

For his third argument, Ivy contends that the use of plexiglass panels and an immovable lectern in the courtroom obstructed the jury's view of Ivy during trial, thus violating his statutory and constitutional rights to be present at trial. The State contends Ivy did not preserve this issue for appeal because he failed to object at trial, and alternatively argues that courts in other jurisdictions have rejected similar challenges to public health protocols implemented during the COVID pandemic.

A. *Ivy preserved the issue for appeal.*

The State contends that Ivy failed to preserve this issue for appeal. We disagree.

It is true that any obstructions would have been readily apparent throughout the course of the trial, yet Ivy made no contemporaneous objection. He did not object to the layout, request alternative seating, or present any evidence or concern during the course of the trial that the jury could not see him. He agrees that he did not raise the issue until his posttrial motion for a new trial. He contends that he was not aware of any evidence to support his claim that the jury's view was obstructed until a discussion with jurors after the trial. And this is supported by the record. During the argument on the motion, with no contrary evidence presented by the prosecutor, the judge and defense counsel stated that after the trial when the jurors were asked to voluntarily stay and speak with the judge and counsel, there was some discussion regarding the ability to see through the plexiglass. The judge relayed her recollection as follows:

> "And it did come up after the jury had finished . . . discussing the case with the attorneys from a legal standpoint, and it was responsive to the Court's question about, you know, a new courthouse. Is there anything that could make your, you know—I don't know what I said, but basically, anything that could help you have a better experience. I

15

wanted to make sure the jury could—could hear and there wasn't things that would permit them from, you know, fully participating.

. . . .

"But the one juror did comment that he—you know, looking through multiple layers of Plexiglass, may not be ideal and it was just for certain jury seats, the ones that were further away from the witness. And one of them, if not the same, made a comment that they could not see Mr. Ivy at all times during the trial because of the podium."

Ivy's attorney argued that Ivy's constitutional right to be present was violated and cited the same cases he does in this appeal.

Accordingly, we find Ivy did preserve his constitutional claim that he was denied his constitutional right to be present at trial due to the inability of the jurors to see him throughout the trial.

B. *Ivy fails to establish that his statutory and constitutional rights to be present at trial were violated.*

Criminal defendants have both a statutory and constitutional right to be present at "every critical stage of the proceedings." *State v. McDaniel*, 306 Kan. 595, 600, 395 P.3d 429 (2017); see also K.S.A. 22-3405(a) ("The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law."). Whether a defendant's right to be present has been violated is a question of law subject to de novo review. 306 Kan. at 600.

The constitutional right to be present "'emanates from the Sixth Amendment right to confront witnesses and from the right to due process guaranteed under the Fifth and Fourteenth Amendments.'" 306 Kan. at 600 (quoting *State v. Davis*, 284 Kan. 728, 731, 163 P.3d 1224 [2007]). The Kansas Legislature codified this right at K.S.A. 22-3405(a),

16

which the Kansas Supreme Court has said "'is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings.'" *State v. Killings*, 301 Kan. 214, 241, 340 P.3d 1186 (2015) (quoting *State v. Engelhardt*, 280 Kan. 113, Syl. ¶ 2, 119 P.3d 1148 [2005]). These rights extend beyond "mere physical appearance" to also include assuring that the defendant "'will be informed about the proceedings so he or she can assist in the defense.'" *Khalil-Alsalaami v. State*, 313 Kan. 472, 488, 486 P.3d 1216 (2021) (quoting *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 [2000]).

That said, Ivy does not identify any particular stage of the trial during which he was denied the right to be present. Instead, he asserts generally that the jury's view of him was obstructed throughout trial because the "layout of the courtroom situated the defense table furthest from the jury box" and there were "several layers of plexiglass" and an "immovable podium" in at least one juror's line of sight. This lack of specificity makes it difficult to evaluate Ivy's claim, since he does not appear to be arguing that his own vision of the jury was obstructed in a way that prevented him from assisting in his own defense or understand any portion of the proceedings. Ivy's argument also does not seem to implicate the primary concern of the Confrontation Clause, which "'guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact.'" *Maryland v. Craig*, 497 U.S. 836, 844, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S. Ct. 2798, 101 L. Ed. 2d 857 [1988]).

Ivy grounds his argument in a different feature of the right to be present, which he describes as "the right to be viewed by the trier of fact." We cannot find, nor does Ivy submit, any caselaw identifying such a right. Instead, Ivy relies on *Riggins v. Nevada*, 504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992), but chiefly focuses on statements made in Justice Kennedy's concurring opinion to argue his claim. But Ivy provides no other authorities which have extended or otherwise formally adopted Justice

17

Kennedy's rationale, which limits their precedential value. Moreover, reviewing the majority opinion and procedural history in *Riggins* demonstrates why Ivy's claim that his right to be seen by the jury during trial was violated is not persuasive.

In *Riggins*, the defendant—who was declared competent to stand trial—had unsuccessfully moved for an order suspending the administration of antipsychotic medication throughout his murder trial, at which the defendant would raise an insanity defense and testify on his own behalf. The district court denied Riggins' motion in a single page order that did not reveal the court's rationale. The jury then convicted Riggins of murder and imposed a death sentence, after which he appealed, arguing that "his involuntary medication with antipsychotic drugs during the trial violated his Sixth Amendment right to a full and fair trial by depriving him of his *right to present his natural demeanor* to the jury as part of his insanity defense." (Emphasis added.) *Riggins v. State*, 107 Nev. 178, 181, 808 P.2d 535 (1991). The Nevada Supreme Court rejected this claim, holding that the denial of Riggins' motion was neither an abuse of discretion nor a violation of his rights because the expert testimony about the effects of the medication on Riggins' demeanor "was sufficient to inform the jury of the effect . . . on Riggins' demeanor and testimony." 107 Nev. at 181. One justice dissented, expressing in part that "[f]orceful administration of . . . mind-altering drugs" violated a criminal defendant's "right to be present as one really is, not as a chemically-conjured persona which bears little resemblance to the 'real' person as he or she would be in the natural, undrugged state." 107 Nev. at 187-88 (Springer, J., dissenting).

The United States Supreme Court granted certiorari "to decide whether forced administration of antipsychotic medication during trial violated rights guaranteed by the Sixth and Fourteenth Amendments." *Riggins*, 504 U.S. at 132-33. The Court then discussed its prior decision in *Washington v. Harper*, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990), which recognized that while "'[t]he forcible injection of medication into a nonconsenting person's body' . . . 'represents a substantial interference with that

18

person's liberty,'" due process allows such action based on a medical determination that "'the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.'" *Riggins*, 504 U.S. at 133-35. Yet the Court added that it had not yet developed "substantive standards for judging forced administration of such drugs in trial or pretrial settings" and this case did not allow it to do so since the district court's order failed to explain any rationale for denying Riggins' relief. *Riggins*, 504 U.S. at 135.

In reaching this conclusion, the Court further explained the State's actions "may well have impaired the constitutionally protected trial rights Riggins invokes" because it was "clearly possible" that the potential side effects of the medication "had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." 504 U.S. at 137. But given the deficiencies in the district court's order, the Court found there was "no basis for saying that the substantial probability of trial prejudice in this case was justified" and reversed Riggins' conviction and remanded for further proceedings. 504 U.S. at 138.

Justice Kennedy agreed with the outcome but wrote separately to express his views that the State would need to make "an extraordinary showing" to justify "administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial." 504 U.S. at 138-39 (Kennedy, J., concurring). Within that context, Justice Kennedy explained that the side effects of antipsychotic medications "can compromise the right of a medicated criminal defendant to receive a fair trial . . . (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering him unable or unwilling to assist counsel." 504 U.S. at 142 (Kennedy, J., concurring). As Ivy notes in his brief, Justice Kennedy then states:

> "It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or

19

sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand, as Riggins did, his demeanor can have a great bearing on his credibility, persuasiveness, and on the degree to which he evokes sympathy. The defendant's demeanor may also be relevant to his confrontation rights. [Citations omitted.]" 504 U.S. at 142 (Kennedy, J., concurring).

Contrary to Ivy's argument, these statements do not establish that the right to be present requires the jury to see the defendant at all times during trial. *Craig* recognized that "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing" which involves "'compelling [a witness] to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.'" 497 U.S. at 845 (quoting *Mattox v. United States*, 156 U.S. 237, 242-43, 15 S. Ct. 337, 39 L. Ed. 409 [1895]). Several courts in other jurisdictions have invoked this rationale to reject similar invitations to find a constitutional violation in situations where the jury was either placed behind the defendant or had to observe the trial proceedings through panes of plexiglass. See, e.g., *Bogan v. Christiansen*, No. 24-CV-10427, 2024 WL 4874217, at *8 (E.D. Mich. 2024); *United States v. Petit*, 496 F. Supp. 3d 825, 828-29 (S.D.N.Y. 2020); *People v. Garcia*, 527 P.3d 410, 418 (Colo. App. 2022).

These cases all accurately recognized that a defendant's right to a face-to-face confrontation with witnesses is merely a "preference," not an absolute requirement, and "'must occasionally give way to considerations of public policy and the necessities of the case.'" *Craig*, 497 U.S. at 849. So even assuming Ivy is correct that this right encompasses an equivalent right to be seen by the jury at all times during trial, that right

20

would not be absolute. In other words, the confrontation right guarantees the defendant the right to face his accusers and likewise requires the jury to view the witnesses and assess their credibility based on their demeanor. This does not include an equal and fundamental right for the jury to see the defendant at any time other than when presenting testimony.

This court also cannot simply ignore that Justice Kennedy's concurring opinion in *Riggins* was specifically directed at the constitutional implications of forcefully administering antipsychotic medications to ensure a criminal defendant's competence to stand trial. The defendant's demeanor in *Riggins* was highly relevant to his insanity defense, so the potential harm was that the jury would misperceive the defendant's demeanor while testifying due to potential side effects of antipsychotic medication and inaccurately judge his credibility. Those same concerns are not present here because Ivy did not testify; therefore, it would be improper for the jury to even consider his demeanor as evidence when determining his guilt. Moreover, Ivy's sole defense was that S.P. lacked a reasonable expectation of privacy under the circumstances so assessing her credibility was more important for the jury.

In sum, Ivy has failed to present any support for his position that failure of the jury to see him at all times during the trial violates a fundamental constitutional right to be present at trial.

Finally, even assuming Ivy is correct that criminal defendants have a constitutional right to be seen by the jury at all times during trial and such a right was violated here, Ivy fails to explain why that error would not be subject to harmless error review. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021) (issues not adequately briefed are deemed waived or abandoned).

The Kansas Supreme Court routinely reviews violations of the right to be present at a critical stage of the proceedings under the constitutional harmless error standard. See *McDaniel*, 306 Kan. at 603-05. Under the constitutional harmless error standard, an error may be declared harmless when the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record; in other words, there is no reasonable possibility that the error affected the verdict. See *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011).

That being said, the Kansas Supreme Court has cited Justice Kennedy's statements favorably in a decision holding that the violation of a defendant's constitutional right to be present resulted in a structural error. See *Calderon*, 270 Kan. at 253 (citing *Riggins*, 504 U.S. at 142 [Kennedy, J., concurring]). "Structural errors 'are so intrinsically harmful as to require automatic reversal (i.e., "affect substantial rights") without regard to their effect on the outcome.' *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)." *State v. Hill*, 271 Kan. 929, 934, 26 P.3d 1267 (2001), *abrogated on other grounds* by *State v. Voyles*, 284 Kan. 239, 160 P.3d 794 (2007). Structural errors defy harmless-error analysis because they affect the framework within which a trial proceeds. *McDaniel*, 306 Kan. at 604.

But *Calderon* involved a defendant who was deprived of an interpreter during closing arguments, despite having been provided one the entirety of trial up to that point. The *Calderon* court explained that harmless error analysis was inappropriate because the failure to translate the closing arguments resulted in "an error which implicates the basic consideration of fairness." 270 Kan. at 253. In reaching this conclusion, *Calderon* referenced the same portions of Justice Kennedy's concurring opinion that Ivy relies on here, but without indicating they were not contained within the *Riggins* majority opinion. See 270 Kan. at 253 (citing *Riggins*, 504 U.S. at 142).

22

The Kansas Supreme Court later limited the structural error analysis to the unique facts of that case. See, e.g., *Engelhardt*, 280 Kan. at 124 (excluding defendant from jury view of crime scene resulted in harmless error); *State v. Mann*, 274 Kan. 670, 682-84, 56 P.3d 212 (2002) (ex parte communication with jurors resulted in harmless error); *State v. Lopez*, 271 Kan. 119, 134, 22 P.3d 1040 (2001) (questioning juror in chambers without defendant's presence resulted in harmless error). Like these cases, any assumed error due to the jury's potentially obstructed view of Ivy during trial did not implicate the same basic consideration of fairness that was at issue in *Riggins*. Again, Ivy chose not to testify, so the evidentiary value of his demeanor was nonexistent, and the nature of his defense benefitted more from the jury being able to view S.P.'s demeanor while she testified. Thus, harmless error would apply.

We have no hesitation in holding that any perceived error stemming from the layout of the courtroom was harmless because Ivy conceded essentially every element of the breach of privacy charge. The only defense he raised was that S.P. lacked a reasonable expectation of privacy under the circumstances, but as explained in the previous two issues, the evidence on that element—S.P.'s testimony—was clearly established and largely undisputed. There is no reasonable possibility that the layout of the courtroom affected the jury's verdict.

IV.    CUMULATIVE ERROR DID NOT DENY IVY THE RIGHT TO A FAIR TRIAL

Ivy next contends the cumulative effect of the errors established in his previous three issues combined to deprive him of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024). That said, the cumulative error rule does not apply if

23

there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). The only trial error Ivy established relates to the prosecutor's erroneous golden rule statements, which this court already determined was harmless considering the entire record. Even if this court considered the prosecutor's statements as separate errors—since there were multiple statements—this court concludes that under the totality of the circumstances, the cumulative effect of these errors did not affect the jury's verdict.

V.      WE MUST REMAND FOR CONSIDERATION OF THE PROPER APPLICATION OF IVY'S JAIL CREDIT

For his final issue, Ivy argues the district court erred by failing to award him 257 days of jail credit for the time he spent in jail pending judgment here, despite acknowledging that the district court indicated it was awarding that credit in another case to which Ivy's sentence would run consecutively. In short, he contends the plain language of the jail credit statute required the district court to award jail credit in this case, regardless of whether it would result in duplicative jail credit.

The relevant statute is K.S.A. 2019 Supp. 21-6615(a), which at the time Ivy committed his crime of conviction required the sentencing court to award "an allowance for the time which the defendant has spent incarcerated pending the disposition of the defendant's case." For nearly 45 years, the Kansas Supreme Court interpreted this language as limiting awards of jail credit to time spent "solely" in custody on a charge being sentenced. See *State v. Smith*, 309 Kan. 977, 981, 441 P.3d 1041 (2019); *Campbell v. State*, 223 Kan. 528, 529-31, 575 P.2d 524 (1978). But after realizing courts were applying this rule inequitably by awarding no jail credit to defendants being held in custody on multiple cases simultaneously, the Kansas Supreme Court overruled this longstanding precedent. See *State v. Hopkins*, 317 Kan. 652, 659, 537 P.3d 845 (2023). Instead, the court adopted a plain language reading of the statute to hold that "because

24

Hopkins spent 572 days in jail while his case was pending, Hopkins must be awarded 572 days in jail time credit." 317 Kan. at 659.

Ivy now contends he was entitled to the same treatment. Because he spent 257 days in jail before being sentenced in this case, Ivy asserts he was entitled to receive 257 days of jail time credit applied to his 21-month prison sentence. The State counters that this court should follow the approach of a recent panel of this court, which recognized that *Hopkins* did not change another sentencing rule stating that "'if consecutive sentences are imposed in separate cases, the defendant is still only entitled to a single day of jail time credit for each day spent in jail.'" See *State v. Feikert*, 64 Kan. App. 2d 503, 508-09, 553 P.3d 344 (2024) (quoting *State v. Davis*, 312 Kan. 259, 287, 474 P.3d 722 [2020]), *petition for rev. filed* August 12, 2024. Thus, the State argues the district court correctly awarded Ivy jail credit to the underlying sentence in Johnson County case No. 18DV1711 since his 21-month sentence for the breach of privacy would run consecutive to that sentence.

In his reply brief, Ivy challenges the applicability of the holdings in *Feikert*, arguing that the panel "improperly incorporates words into the old statute to harmonize it with the revised version of K.S.A. 21-6615(a)." Although *Feikert* indeed mentioned the recent amendments to K.S.A. 21-6615(a) near the end of the decision, Ivy mischaracterizes the panel's statements. Put simply, the panel made clear that it was merely noting the consistencies between its holdings and the recent amendments, explicitly acknowledging that "[n]o one argues that these statutory amendments apply here." 64 Kan. App. 2d at 509-10.

Ivy is correct that *Feikert* is not binding on other panels of this court. See Supreme Court Rule 7.03(b)(2) (2025 Kan. S. Ct. R. at 46); Supreme Court Rule 8.03(k)(1) (2025 Kan. S. Ct. R. at 61) (timely filing of a petition for review stays the issuance of the mandate of a Court of Appeals opinion, which may only then be cited as persuasive, not

25

binding, authority pending disposition of the petition for review). Several panels have nonetheless cited the panel's analysis as persuasive despite a pending petition for review being filed. See, e.g., *State v. Wheeler*, No. 127,241, 2025 WL 24833, at *2 (Kan. App. 2025) (unpublished opinion), *petition for rev. filed* February 3, 2025; *State v. Miner*, No. 126,647, 2024 WL 4471140, at *3 (Kan. App. 2024) (unpublished opinion), *petition for rev. filed* November 1, 2024; *State v. Price*, No. 126,481, 2024 WL 4717626, at *6 (Kan. App. 2024) (unpublished opinion), *petition for rev. filed* December 2, 2024.

In any event, even applying the *Feikert* panel's analysis here does not resolve the issue because it is unclear from the record whether the district court awarded *any* jail credit to Ivy. Although the district court acknowledged at sentencing that Ivy may not receive all 257 days of jail credit because of the consecutive sentencing, he was still entitled to receive 257 *total* days of jail credit under *Hopkins*. Given that 257 days exceeded his six-month sentence in Johnson County case No. 18DV1711 by about two-and-a-half months, the record shows Ivy should have received at least some jail time credit in the current case. The appropriate disposition is to remand for consideration of the appropriate amount of jail time credit.

In conclusion, we affirm Ivy's conviction for breach of privacy, finding that the evidence was sufficient to support his conviction, the prosecutor's golden rule argument in closing was harmless, and Ivy's right to be present at trial was not violated by the inability of one juror to see him at all times. Due to the inability to determine from the record whether Ivy was given the proper amount of jail credit, we vacate his sentence and remand for a proper determination of jail credit.

Conviction affirmed, sentence vacated, and case remanded with directions.